The first case for argument is Larry Johnson v. Schulte Hospitality Group. All right, very well. Mr. Kushner, we'll hear from you first. Good morning. May it please the Court. My name is Jordan Kushner, and I have the honor of representing the appellant, Larry Johnson. And the question here is whether he produced enough evidence to survive summary judgment on claims for discrimination and retaliation. When, you know, in early June of 2000 and late May of—early June of 2020, he checked into a Marriott Hotel in Woodbury shortly after the murder of George Floyd, a black man, and first was rudely greeted when he entered the hotel, then was told that he had to go back to his—produce proof of his Bonvoy membership in order to check in, then found out that he had a room with—dirty room, dirty sheets, and was refused his request to change rooms but told that he had to bring his sheets down to the lobby so that the clerk could inspect them and make sure they were dirty. And then he was given a new pair of sheets and told to change them himself, still told he couldn't go to another room, complained about it the next day to the assistant manager, civilly tried to explain that it was discrimination and he shouldn't be treated that way, and asked again for another room, and was told at that point by the assistant manager that to leave the hotel, and when he tried to argue the case further, she called the police and had him ejected from the hotel. A reasonable juror could easily conclude, based on this course of events, that because this behavior was so outrageous and far from what you would expect from a premium hotel, that Mr. Johnson was discriminated against because of his race, and that when he complained about it, he suffered unlawful reprisal and retaliation, and that these all constitute violations of the Minnesota Human Rights Act, public accommodations discrimination, and unlawful reprisal discrimination, and 42 U.S.C. section 1981, discrimination in contracts, and the retaliation component of section 1981 as well. And we're just here on the Minnesota Human Rights Act, right? Also section 1981. Oh, you are carrying the 1981? Right, but the dismissal of both of those causes of action under both of those statutes are being appealed. I don't, the legal standards are not, I don't think are significantly different for these purposes. The main issue on the discrimination is whether or not, you know, there was sufficient indirect evidence or circumstantial evidence of discrimination, and we're relying on the case law, first under Minnesota Human Rights Act, which says that if the treatment is so at variance from what would normally be expected, that that can be prima facie evidence of discrimination. The district court judge said that standard didn't apply based on Minnesota case law, which had only applied that standard in public services discrimination cases and public accommodations discrimination, excuse me, public services and employment discrimination cases, but hadn't had a case where it explicitly said it applied to public accommodations. Since then, that issue has been resolved because there was a Minnesota Supreme Court case in December of, excuse me, Minnesota Court of Appeals case in December of 2022 that applied that standards to a public accommodations discrimination case as well. And the section 1981 has similar case law that talks about that you can show, if the practices were so departed from normal procedure, that that can constitute evidence of discrimination as well, which I think is very similar. Well, counsel, assume you're right about the standard. And assume you're maybe even right in normal times. This was right after the pandemic began. What evidence do you have that at that time, in that setting, how many months, three months after it started, four months? How many months do you say? I'd say about two months. Exactly. After the restrictions started. Thank you for the accurate statement. You're closer than I was. But what evidence do you have that at this time, and the way hotels were doing at this time, that it's so at variance? Well, the evidence is, you know, first of all, because some of what they did to him had nothing to do with the COVID situation. And on the other issues, their own testimony of their own employees, you know, demonstrated that it still wasn't the normal practice. So certainly being rudely greeted when you enter the hotel, and then being told that you had to show that you were a member of the hotel in order to check in, which clearly wasn't the requirement, that had nothing whatsoever to do with COVID. I don't think there's no suggestion that it does. What shows that it had to do with race? Again, because the treatment was so at variance with what would be expected. We had a hotel expert who explained that. That's your whole argument is the so at variance theory. It's not a no comparator theory. Right. So to follow up on that, so your so at variance is in your argument, gets you not only the prima facie case, but you're saying it carries over for pretext as well? Right. And that their explanations aren't worthy of belief as well. There's contradictions. So with respect to the, well, with respect to the showing that you're a Bonvoy member, it was agreed by everyone that that's not a requirement to check into the hotel. Well, didn't the hotel said that they were checking things like that during the pandemic council? I didn't see anything like that. I thought the manager, the person who actually did this, it's a she, right? Oh, it's a he. Yeah. No, I'm sorry. The person who was rude at the door, the person greeting him. It was a he. I thought it was a she. Anyhow. It was a she. It was a she. The one I'm talking about at the end. The woman who came to the door. Right. That's the one I'm referring to. And I was pretty sure it was a she. But anyhow, didn't she say that they used a Bonvoy at the time? No, I did. I don't, I'm not aware of anything in the record where she said that. I may be wrong. Because of the pandemic, you had to be a Bonvoy member. I mean, it was a. No, I mean that they checked it carefully. Go ahead. I mean, the hotel was open. There were a lot of empty rooms because of the pandemic. They had a desire to fill the room. So, it doesn't make sense that they would make a customer feel so unwelcome and make it so difficult for them to check in when they're, in fact, a paying customer. And they did say it was not their normal process in normal times. To check Bonvoy memberships. I think they never claimed it was their normal process in any times. I think the clerk was kind of contradictory. He said it wasn't required. He said it helps if you put the number in at the beginning. It makes things go more smoothly with the check-in. Right. So, can I follow up again on putting the so at variance in pretext? You also followed up with different explanations. So, help me understand how. So, assume that that's sufficient for the prima facie case, that this was so at variance. From what they would normally do and how they would treat their customers. And then they come back with their explanations have been discussed. And then the pretext. Tom, walk me through that a little bit more detail. Sure. Because it seems like a new way to look at pretext. Is that fair? I don't know that it is. I mean, you have to look at whether the pretext, or whether there's reason that, you know, that you can't believe it. You know, is it not worthy of belief? And so, when they refused to change rooms, I mean, we got a difference in factual circumstances here. It's not really an issue whether there's pretext or not. But the clerk said that he offered a room change. My client says he didn't. But he and both the assistant manager both agreed that it would be the proper thing to do in that situation to change a person's room. So, the question isn't whether they should have changed rooms, but whether or not they offered him a room change. And that's a conflicting testimony. They did bring the former general manager afterwards and said, well, it's because of COVID. So, we wanted them to avoid changing rooms. But that contradicts, you know, again, there's factual differences there. Because their own employees who actually work with customers directly said otherwise. They said that, you know, that there should have been a room change. They didn't use COVID as a reason not to change rooms. And there was no dispute that there were many clean rooms in that hotel that they could have moved them to. Go ahead. No, go ahead. Did they, am I right that they didn't charge him for the stay? I think they ended up refunding the money. And am I right that they gave him some number of Bonvoy points as a courtesy because of the inconveniences? They did. And would those things be relevant in deciding whether what they did was so at variance from what would be reasonably expected since hotels are known sometimes to make mistakes and then give people compensation like that? I think it's an argument to make a trial. No, I'm talking about. I don't think for summary judgment purposes it comes close to undermining the cases for discrimination. You know, again, I think it's something that factors into the whole mixture for purposes of fact finding, but I think we have to. So, at variance, what's your best case on that? You may have said it earlier, but I want to hear it again. The recent Minnesota Court of Appeals case. Which is. That's your leading case? Sorry. How is that relevant to the 1981 claim or is it not? I think the 1981 claim, I think the Village of Arlington Heights versus Metropolitan Housing, which a number of cases cite that talk about the departures from normal procedures being the grounds for determining discrimination. That can be one of the grounds. The ground court case? Yeah. I think in the language is cited in a number of other cases, so I think that's. Has our court ever applied that in a 1981 case? I don't. I didn't. I don't have any Eighth Circuit cases on point. I didn't see any Eighth Circuit cases that contradicted it. I think it's also really critical to emphasize on the retaliation that, you know, there's no dispute that he complained about his treatment and said it was discriminatory. And then they called the police and ejected him from the hotel. And there's just really no way to. The only question is whether there's a causal connection between him complaining about discrimination and his ejection from the hotel. And there's no reasonable way whatsoever to argue for purposes of summary judgment that, you know, you couldn't determine this was retaliatory. How quickly did that happen from the point where he makes those statements about the racial discrimination and the police calling? I can't give you a time frame. Is it under ten minutes? You know, I can't say with certainty. There's video. That never came up, the timing issues. So I think it's probably under ten minutes. I can't say definitively. It didn't seem to take a very long. It didn't take a very long time. And, you know, so you have someone who claimed that she felt harassed and uncomfortable without any concrete behavior by my client that could justify her saying that she was harassed. And obviously, you know, customer complaints are part of the job if you're a hotel assistant manager. So just to call the police and get off my property and to call the police to have him removed, you know, again, there's no way that you could rule out that a jury could reasonably determine that that was retaliation. And she was actually back in her office during some of that time period, right? Yes. So nothing else was happening between the two of them. Right. You know, she left. She, according to my client, when she had to take it, she told them some expletives, get the F off my property. And then she left and then called the police and had him removed. But, you know, again, this isn't how you would expect the customer at a premium hotel to be treated, even on a happy customer. So I'll reserve the rest of my time for rebuttal. All right. Very well. Ms. McCormick, we'll hear from you. May it please the Court. My name is Megan McCormick. I represent Schulte Hospitality Group in this case. We're requesting that you affirm the district court's ruling for two reasons. First of all, there is adequate evidence and no question of fact that Schulte employees had legitimate nondiscriminatory purposes for every action they took in relation to Mr. Johnson's stay at this hotel. Mr. Johnson has proffered absolutely no evidence to show that there would be any reason for a reasonable juror to find that this was pretext for discrimination given the legitimate reasons. Secondly, as the retaliation and reprisal claims, there is an intervening fact. We acknowledge that Mr. Johnson complained of discrimination to the manager. The intervening act that cuts off the complaint with the adverse action of removing him from the hotel is that he became agitated. He's in the lobby. His testimony says he didn't, but there's a video. He's in the lobby. He becomes agitated. The testimony of my client is that she continues to try to resolve this issue. He won't stop. Isn't that a fact question for a jury? You said he's agitated. There's a video. I don't think that at least the video I'm remembering, except for Mr. Johnson's video, doesn't have audio. And so agitation, upset, reactions, isn't that for a jury to determine? Well, the agitation is something different than the complaints about discrimination. The Keele case in the Eighth Circuit, which is an employment discrimination case, is on point here. That's the case where an employee in Missouri filed an employment claim under the Missouri Human Rights Act, claiming he sought ADA, some accommodation from his employer. They said no. In saying no, he became very upset, screamed at his employer, and then got fired for insubordination. In that claim, they found that his reaction, his outburst, cut off the causal connection, and that was decided on motion for summary judgment. Here, it's the same thing. That was a reason for firing. This is a reason for calling the police the retaliatory conduct. And so isn't it a fact question whether someone – the video shows a distance. It was COVID time, right? So people are apart. People talk with their hands, with gestures that don't necessarily mean aggression. Could be. And it just seems a little different than the employment situation, where you've done something clearly in violation of the employee-employer relationship, and there's no contest about that particular fact. Here, I'm just wondering if simply saying, I was concerned enough to call the police is enough, when Mr. Johnson can test those facts. The undisputed testimony, however, of Ms. Ball, who is the one who called the police, was that she was feeling uncomfortable. Part of that is this whole context of COVID. She's the only employee in this hotel. She has no backup. She started to feel threatened. She asked him to stop and leave. He wouldn't. She said, if you don't leave, I will call the police. He wouldn't. And then she retreated to her office, where she felt safer, and called the police. She also testified, which is in the record, that she's had to do this before. She actually did it for a patron who did not leave who was white. This isn't something, this is part of her job and something she has to do, but there's no dispute that she felt threatened being alone in the hotel at that time, given his, when he started to get agitated, not because of the discrimination. Counsel, that begins to sound a lot like just credibility, credibility, credibility of your witness. And so I've got to ask this question. I think what's happening in the Minnesota cases is kind of a shift. It's a different kind of comparators when you do it to how the business would normally operate or something like that. And so you may even have a little more burden on that. But let's focus on the retaliation for a second. They kind of go together. So just tell me how many other people of other backgrounds, other protected categories, were treated the same way? Does the record reflect? She recalled and testified that she's had to call the police on three different patrons. Was that confirmed by anything except her testimony? That's where I started on credibility, if you see the way I thought about it. Yep. Okay. Thank you. Whose burden is it to show whether there were comparators? Whether they were what? Whether there are comparators of other races. It's plaintiff's burden when showing discrimination. And that was part of the reason motion for summary judgment was granted. Moving on, generally plaintiff's briefing, as well as his argument here today, has neglected to address COVID. That's the elephant in the room here. The hotel, the record is replete with facts stating how this hotel changed. We're two months into COVID. This is a period where there's no vaccines. Borders are closing. We're wiping down our groceries with Lysol. Like no one knows what's going on. This hotel went. I bet you those last three facts aren't in this record. Or are they in the record? They aren't. Yeah, go ahead. But what is in the record is that. Stick to the record, yeah. Notice of the obvious. This so affected this hotel, they shut down two whole floors. They only had housekeeping coming once to twice a week. They had one single employee in the whole hotel. They had abandoned the procedures they had before for service and had said that the one single employee who was working at the time had to take it upon him or herself to deal with the problem. They were kind of just making it work as they could. The issue where he feels like he was greeted in a rude way. The door was locked. There's a sign that says pick up the phone to talk to the front desk to be let in to check in. He doesn't do that. So she greets him and he says, she says, how may I help you? There is no question of fact here. He's not, this isn't, I don't think. Your opposing counsel didn't mention that you noticed today, I don't think. I know. Go back to retaliation. Sure. Okay, and tell us again what you think your best argument is against the retaliation. It's undisputed that this woman was working alone in a hotel. She has a patron who initially complains of discrimination. She tries to, she apologizes, which Mr. Johnson acknowledges. She tries to placate him in any way she can, being in the service industry. He refuses and keeps going and going, and she starts to feel uncomfortable when he becomes agitated and is getting very mad at her. So she feels uncomfortable. At that point, she calls the police. I don't think that testimony is disputed. That's how she felt, and she has the right to do that in that position. But to say it's not disputed is to say they're not saying she didn't feel that way, but as a matter of factually whether or not he was acting in a way that was so aggressive that would justify calling the police. Now, that could be in dispute, right? I mean, it's one thing to say it's not disputed that she testified to that. There's nothing to contradict that she actually didn't feel that way. Was the question whether her motive was fear or whether he actually behaved in a way that somehow constitutes aggression? Well, plaintiff testifies he does not. The video shows that he is getting agitated and acting in a certain way. Is it really relevant whether he actually crossed some hypothetical line about aggression or is the question about her motive? I think the question is her motive, and when she says, I'm feeling uncomfortable, please leave, he refuses. So at that point, that's when she acts. Go ahead. I want to briefly discuss the SOET variant standard. This case actually was decided in October of 2022. I filed my brief on October 7th. This came down October 22nd, so I didn't get to address this in my brief. The Aroma Shodu case in the Minnesota Court of Appeals says that they are applying the SOET variant standard. If you read the text of that decision, they seem to actually be applying the standard that is applied by the district court in our case. In that case, the plaintiff is a black Muslim woman. She's in a shop. There's two white patrons as well. The defendant's employee notices that a pair of earrings is missing and accuses plaintiff rather than the white patrons of stealing the earrings. The court says, we believe that this SOET variant, this conduct is SOET variants from the store, based on the fact that they treated the white patrons different than plaintiff. That's actually looking at this treatment of similarly situated individuals rather than SOET variants. I would say that this doesn't mean that we have to apply SOET variants here, but even if we do, the whole situation is that there is no evidence in the record, and the district court notes this in a footnote when they say they're not applying the SOET variants standard in our case. There's no evidence to show what is SOET variants in June of 2020. No one has said that. There is evidence in the record that the hotel had to abandon their standards. They were kind of whoever was working that day had to troubleshoot as they went. The situation was not one where these people could contemplate what they're doing. Plaintiff's expert report is highly speculative and does not address COVID. At most, his conclusions in that report say because the hotel was understaffed, they should have been better at managing customer complaints. That's simply not supported by the record. That's total speculation. The record shows that there's one employee at a time. They can't do anything. The other evidence that plaintiff has used to show that this was SOET variants is plaintiff's own testimony that as a Bonvoy member, he stays at these premium hotels and has had much better experiences. If it really is, if we don't look at sort of the general way a hotel would treat its customers during a stay and we have to focus in on COVID, doesn't that cause some problems too? Because as you've pointed out, nobody knew what to do. So what would it be at variants from? So I don't know that your analysis helps us too much either. The SOET variant standard is SOET variants from what reasonably could be expected from the plaintiff at that time. I don't know. I believe what would be, I don't believe that the expert report creates any question of fact or plaintiff's own testimony. Well, how about this? If it was so, if everybody was sort of off the rails in terms of their typical protocols and the way they handled problems and things that popped up, wouldn't that maybe be more ripe for discriminatory conduct and be more open for quick judgments on the part of staff that might be not based on good policy? But in each instance, which plaintiff complains, including the dirty bedding, things like that, we have presented legitimate non-discriminatory purposes. There's testimony that other guests have had to change their own sheets, unfortunately. Is that great service? No. But it's not just something that happened to plaintiff out of discrimination. What is your position about his at variants after, at pretext stage, after the legitimate reasons? I don't think it applies there, and I don't think he's actually, there's no case law saying that it does apply to show pretext. Independent of case law, why would it not apply? Why, or could it apply in some situation? Yeah, sure. If it did apply, there's still no, that doesn't discount the legitimate non-discriminatory purposes. There is no, he hasn't shown pretext. He, he's basing everything on the standards he experienced before COVID, before at other hotels, at other Marriott, Bonvoy membership hotels. Counsel, did he say that in his own words? He was basing it on his experiences before COVID. Yeah. Did he say that? Mr. Johnson did testify. And would you find that right in the record? I believe so. Thank you. He testifies that he knows he was discriminated against because he felt that way, and also he had been treated differently because he's a Bonvoy membership, and he's been treated differently at all these other hotels. Did he say he had stays since COVID started? What? Did he say he had stays since the middle of March when COVID started? He did not. He testified he stayed at Bonvoy hotels at least 10 different occasions in the past, but he didn't specify, and I'm not sure if he was asked, he did not specify in the record that he stayed during COVID. Is there any inference from his testimony? I couldn't glean one, to be honest. You know, we've presented in our position is that there are legitimate nondiscriminatory purposes here. We're not saying that his stay was perfect. He was compensated, which I do think cuts towards the fact that they were trying to make amends. They understood that this was not a great stay. This is just something that was happening, and this is the state of the service industry in June of 2020. There's only so much that can be done, and there isn't a question of fact. These legitimate nondiscriminatory purposes are there. They're on the record, and Plaintiff has only rebuffed them with a report that doesn't address COVID, arguments that don't address COVID, and anecdotal evidence of past days that, again, don't address COVID. To ignore COVID in June of 2020 is beyond belief. It doesn't make sense. I think it discounts Plaintiff's arguments, and that's our position. For those reasons, we'd ask you to affirm the district court's decision. Very well. Thank you for your argument. Thank you. Thank you. First, to clarify, Mr. Johnson. We'll hear from you on rebuttal, Mr. Gush. Thank you, Judge. To clarify, Mr. Johnson testified that he was a very frequent hotel guest and had a lot of stays at Marriott's. Wasn't asked how many were before and how many after COVID. I think you can infer that he was traveling around in the other stays, probably before and after COVID. But he wasn't asked that, but he did testify based on his experience. That sounds like there's an absence of evidence on that point from what you're both telling me, right? Yeah. But so I think the inferences have to go in favor of the Plaintiff. Reasonable inferences. We'll proceed. I think it's reasonable, but it's reasonable to conclude that COVID or no COVID, you're not asked to go back to your car and prove your Bonvoy membership when you're a paid guest at a hotel. It's reasonable to conclude that you're not going to be refusing room change when you have dirty, soiled sheets. With COVID or no COVID. And it certainly doesn't, even if they're claiming it was COVID, it doesn't, well, why would you, if you're trying to keep things clean and safe, why would you expose someone to dirty sheets? Get them to another room so no one's exposed and catches COVID. I mean, they're actually creating a more serious health problem based on their treatment. So I think that really what gets down to how this is so pretextual that they're trying to justify these unhealthy practices based on COVID. Let me just explain. There's a lot of confusion here in how retaliation is being addressed. But we don't have to prove discrimination for retaliation, whether she treated white people or black people differently. And she didn't have any specifics whatsoever, couldn't name anyone that she supposedly treated similarly. But regardless, the question isn't, at that point, whether he's being treated badly because of his race, but whether he's suffered adverse action because he complained of discriminatory practices. And her feeling uncomfortable just doesn't cut it. You know, she felt. Why not? Because. Why not? Why if there's some guy aggressively arguing with her in the lobby and he won't leave? She's alone there. Why isn't that a sufficient reason? There has to be an objective. There has to be an objective basis to, you know, to justify what she's claiming are her feelings. And, you know, there has to be something from him. So the fact that she's uncomfortable by a black man just who's complaining doesn't cut it. There isn't evidence that he was yelling. And she didn't even agree that she couldn't say that he was yelling. You know, certainly wasn't screaming like the employee in Keogh. He was complaining. And so just asking him to leave is retaliation. You know, calling the police is worse. He's a paid hotel guest and she's cutting off his stay and asking him to leave because he's an unhappy customer. So, yeah, I mean. You've got to stand there and let the person raise his voice and keep. We don't know how much he was raising his. That's in the record. She's just got to stand there and take it. She doesn't have to stand there. Federal civil rights case. She could have walked away. She did. But, you know, there isn't any. She herself said he didn't threaten her in any way. So this is, you know, you can't allow an employee's subjective behavior to justify discriminatory conduct. I mean, we're going back to, like, you know, pre-60s South where, I mean, so I think that's. That's not in the record either. I bet that's not in the record either. Go ahead. That's not in the record, but I think we're talking about and trying to address the implications about the, you know, about trying to, you know, let someone just say they felt threatened and therefore they can do whatever they want. So that that just doesn't, I just don't see how that flies. And, you know, the, again, the standards, I think there's plenty of evidence to determine he was being reasonable. So thanks. Thank you for your argument. The case is submitted and the court will file a decision in due course.